*Reversed and remanded.*

Opinion delivered June 1, 1887.

No. 5388.

ED. OSBORNE v. THE STATE.

1. INDICTMENT—AMENDMENT—PRACTICE.—Matters of form in an indictment or information are amendable before both parties announce ready for trial upon the merits, but not thereafter. Allegations as to the court and term at which the indictment was presented are matters of form, and amendable, subject to the above limitations.

2. SAME—PRACTICE.—Over objection by the defense, the trial court permitted the State to substitute, by amendment, the words "fourth Monday" in place of "first Monday," where the indictment designated the commencement of the term at which the indictment was presented. Prior to the allowance of the amendment, both the State and the defense had announced ready for trial on the merits, but the defendant had not been arraigned, nor had he pleaded to the indictment. *Held*, that the allowance of the amendment, after such announcement by both parties, though before arraignment or plea, was erroneous, because in contravention of Article 550 of the Code of Criminal Procedure; but, as the defect was in a matter of mere form, and as no exception therefor was taken to the indictment, the error was cured by the verdict, and is not cause for reversal.

3. JURY LAW—SPECIAL VENIRE—PRACTICE.—In organizing a jury in a capital case, the name of one C., which was the eighth on the copy of the venire served on the defendant, was reached and called, when the sheriff informed the court that C. had not been summoned; whereupon the court, over objection by the defense, proceeded to complete the panel out of the remaining veniremen. The defense waived nothing and reserved exceptions. *Held*, that the action of the court was without authority of law, and in derogation of valuable rights guaranteed to the defendant by Articles 617 and 640 of the Code of Criminal Procedure. The court should either have suspended the proceedings until the said C. should be brought in, or a new *venire facias* in lieu of the first one should have

been issued, and the organization of the jury accomplished *de novo.* See the opinion for a lucid exposition of the whole matter.

4. MURDER OF THE FIRST DEGREE—CHARGE OF THE COURT—"LYING IN WAIT" is evidence of express malice, and one of the standard illustrations thereof; but the code of this State nowhere provides that a murder committed while lying in wait is *per se* murder in the first degree. It is error, therefore, to instruct a jury to the effect that a murder so committed is *per se* murder in the first degree.

APPEAL from the District Court of Colorado. Tried below before the Hon. George McCormick.

By the indictment in this case, it is charged that Ed. Osborne, the appellant, on December 22, 1886, did willfully, unlawfully, and with express malice aforethought, kill and murder one West Kirby, by shooting him with a pistol and a gun, loaded and charged with gunpowder and bullets. In March, 1887, the accused was tried, and was found guilty of murder in the first degree, with the penalty of death assessed therefor.

The appellant and the deceased were freedmen and neighbors, living within the corporate limits of Columbus, the county seat of Colorado county. It appears that for some time prior to the assassination of Kirby, he and Osborne, the appellant, were at enmity on account of Kirby's connection with the prosecution of one Walker, for poisoning chickens. Early in the night of December 22, 1886, Kirby was found lying near the gate of a field in which he pastured his horses at night. He had been shot, and, though alive, was not able to get up, and died where he was found, the same night.

Robert Williams, the first witness for the State, lived about two hundred yards from where the deceased was found wounded. Witness, while sitting in his house, heard five shots, the first and second of which were fired in rapid succession, and then, after a short interval, three more were fired in rapid succession. Witness then heard some one hallooing, and immediately got his gun and started in the direction of the place of the shooting. He advanced cautiously, being apprehensive of danger himself. At a distance of about two hundred yards he found Kirby lying on the ground, and asked him what was the matter, to which he replied that he was shot. Witness asked him who shot him, and he answered: "Ed. Osborne shot me," and in reply to witness's inquiry, said that Osborne was over in Logue's field. Being then requested by Kirby to help him up, witness told him

he could not get up. Then he asked for water, and about that time the wife of witness came, and witness sent her for water, which she brought, and witness gave to Kirby, whose head he was then supporting. Witness thought that not more than six or eight minutes elapsed after the shots were fired until he reached the deceased, who was lying near the Logue field and about thirty or forty feet from the gate of the Seymour pasture. Witness was the person who first reached the deceased after the shots were fired, and as he approached he inquired who it was lying there. Deceased said: "Is that you, Bob?" and the witness went up to him. While waiting for the water, the witness asked deceased what he was doing to Ed. Osborne when the latter shot him, and he replied that he was doing nothing, and that he begged Osborne not to shoot him any more, and Osborne said: "I will; I am going to kill you," and kept on shooting him. Larkin Hope, a deputy sheriff, was the first white man who came there, and he got there a few minutes after witness did. Sheriff Townsend came after Mr. Hope did, and quite a crowd collected there. Witness remained until Kirby died, and then took his body to his house and undressed it. Kirby had received five wounds. One was in the back of his right shoulder, and was made with eleven shot; one in front of the left arm, with seventeen shot; one entered about the small of the back, and came out in front about an inch lower than the entrance, and the two others entered the back but did not come out. The last three shots were made with larger balls than the first two, and, judging by the size of the wounds, were made with pistol bullets. Certain clothing being shown to the witness, he identified it as the same he had taken off the body of the deceased, and pointed out the holes made by the balls.

Cross examined, the witness said he took his gun with him because he did not know what was the matter, and he approached Kirby cautiously because he did not know but what somebody would shoot him. It was a dark night, but he could distinguish a man from any other object as far as across the street. His relations with both the defendant and the deceased, and also with the Walker family, were and had always been friendly. Kirby and some of his neighbors were unfriendly, because he did not like the way they lived. Witness found no weapons on or about Kirby. A bridle and the gate key lay near him.

Larkin Hope, a deputy sheriff and witness for the State, testified that, on the night of December 22, 1886, he heard two re-

ports of a shot gun, and ran out on his gallery, when he heard three reports of a pistol. Then he heard hallooing and ran to where it was, and there found West Kirby lying upon the ground, shot. Kirby was rolling around upon the ground and would not get up. Bob Williams and two women were with Kirby, who was in his right mind and knew his condition. He recognized witness, called him by name, and asked him to set him up. Witness asked him who shot him, and he replied that Ed. Osborne shot him. Witness then told Kirby that he was in a dying condition, and for God's sake to tell the truth as to who shot him. He replied, "I know I am going to die, and I know what I am talking about as well as you do, Mr. Hope. I know that it was Ed. Osborne that shot me, as well as I know that I am talking to you; I begged him not to shoot me any more, and he said he would shoot, and kept shooting me." About ten or fifteen minutes elapsed from the time witness heard the shots until he reached Kirby, who was then about five or six hundred yards from witness's house. It was about eight o'clock in the night when witness heard the firing, and Kirby died some twenty-five or thirty minutes after the witness reached him. Sheriff Townsend arrived about five or ten minutes after witness got there. The shots were very rapid, but witness could distinguish the shot gun reports from those of the pistol. About four or five minutes after witness got to Kirby, Ed. Osborne came there, and was immediately arrested by witness for the murder of Kirby. Immediately after that Sheriff Townsend arrived and spoke to Kirby, saying, "West, you are badly hurt; who shot you?" Kirby replied, "I know I am going to die; Ed. Osborne shot me;" and then he asked Mr. Townsend to turn him over, so that he could talk better. He was turned over, and Townsend asked him if he was certain it was Ed. Osborne that shot him, and he replied, "Mr. Mr. Townsed, Ed. Osborne killed me." By the sheriff's order, the witness and George Crawford guarded the ground all that night, and permitted no one to enter Logue's field or Seymour's pasture. The next morning at daylight Townsend came, and a search for tracks was made. The witness gave the details and results of the search as they appear in the testimony of Sheriff Townsend, the next witness for the State.

The cross examination of this witness Hope elicited his statement that there was a puddle of blood close to the gate of the Seymour enclosure, and right at the puddle of blood were im-

pressions in the sand as if some person had there fallen on his hands and knees, and other impressions indicated that some one had crawled from the puddle of blood to where Kirby was lying when found. Gun wadding was found, and, judging from the spot at which it was found, Kirby, when shot, was right at the gate, and the person who shot him was in the open space between the Logue and Seymour enclosures.

J. L. Townsend, sheriff of Colorado county, was the next witness for the State. As to what transpired where Kirby was lying, after the arrival there of the witness, his testimony was in substantial accord with that of the previous witness, Larkin Hope, but he stated that Osborne, when accused by Kirby, spoke up and said, "Mr. Townsend, that negro accuses me because we are deadly enemies." Witness then warned Osborne that anything he said might be used as evidence against him, but could not be used for him. After the warning Osborne said to witness: "Go with me to Mr. Bayer, and I can prove that I was standing at (or in) his store door when the firing commenced." Witness sent Osborne to jail and immediately went to Osborne's house, finding the latter's wife standing at the gate. Entering the house witness made a search for weapons, and under the head of Osborne's bed found a forty-five calibre six-shooter, three chambers of which had been freshly discharged and reloaded. Going thence to Osborne's crib, he there found a double barreled muzzle loading shot gun, both barrels of which had been freshly discharged. He put his finger in the barrels and got dampened, fresh burnt powder on it.

About daylight the next morning, the witness, together with Larkin Hope, George Crawford and Henry Green, made diligent search for tracks leading to and from the place of the killing. Starting at that place, they made a half circuit, first through the Logue field and then through the Seymour enclosure. Then they made another half circuit which led them into the Logue field, and in some sixty or eighty steps they found fresh tracks which indicated that the maker of them was going north. Planting a stick where the tracks were first found, the witness followed them through Logue's field to a water furrow, and over Osborne's garden fence, through his garden, to a fence in front of and about two steps from the door of the crib in which the witness had found the gun the night before. Between the fence and the crib door the witness saw where something had been stuck in some dry horse manure, and in the muzzle of the gun

he found some dry horse manure. He returned to the point where he had planted the stick, and thence followed the other end of the trail for about a hundred and thirty steps, to where it turned due east to within fifteen or twenty steps of the fence near which Kirby was found. Where the tracks became invisible the witness and his party encountered weeds, grass and grass burrs, through which they plainly observed where the weeds and grass had been mashed down, and by following that sign they were led directly to where Kirby had been found. When Osborne was put in jail and searched, grass burrs were found on his pantaloons. The tracks were fresh and had been made with large shoes, to the heels of which, and on the outer edge of each, there had been tacked a piece of leather, which made in the soil a deeper impression than the rest of the heel. The tacks with which the extra leather was put on made impressions so plain that they could be counted. The span of the tracks showed plainly that the maker of them was moving more rapidly than an ordinary walking gait. They led to no gate, but across Osborne's garden fence, and thence across his garden to the door of his crib. After the search for tracks, etc., witness went to the jail, took off and examined Osborne's shoes, and on the outer edge of each found a piece of leather fastened on with tacks which projected considerably. Counting these tacks, he found their number to correspond with that of the tack impressions counted in the tracks which had been followed to Osborne's crib. Witness then took the shoes themselves and applied them to a number of the tracks, and found the shoes to fit the tracks exactly. Osborne has a large foot, and wears a number twelve shoe. The shoes taken off of him were here exhibited by the witness, and also the gun and pistol which had been found on Osborne's premises. While searching Osborne's house for weapons, the witness found a wad of paper stuck up behind the door, and it was the same kind of paper as the gun wadding discharged where Kirby was shot. From Osborse's house to where Kirby was shot the distance is six hundred and fifty-seven steps. No horse or mule tracks were found in Logue's field. In Osborne's pocket three pistol cartridges were found, two of which had brass caps and the third a copper cap. One of the freshly loaded chambers of the pistol found in Osborne's house contained a copper capped cartridge; the rest of the cartridges had brass caps. Not more than twenty or thirty minutes elapsed after the shooting until the witness got to where West Kirby

was lying. Kirby lived some five or ten minutes after witness reached him. Two gun shot wounds were inflicted on Kirby, one of them in the back of his right shoulder, and the other in the front of his left arm. Three pistol shots struck him in the back and hip. There was a puddle of blood near the gate of the Seymour pasture. ·

Cross examined, Sheriff Townsend said it was about one thousand one hundred and thirty-seven yards from where Kirby was shot to Bayer's store. Judging from the blood and other signs upon the ground, West Kirby, when fired upon, was at the gate, and the person who shot him was twenty-five or thirty steps from him, and was outside of the field. Witness did not remove any cartridges out of Osborne's pistol, but examined it closely and saw that three chambers of the cylinder were freshly powder burned. It is easy to tell whether a shot gun has been recently discharged. By examining the tubes and muzzle, and by passing a finger into the barrel, damp powder smut will be found if the gun has been recently discharged; whereas the smut of a gun not recently discharged is dry. The tracks leading to Osborne's crib were very plain; not one of them was missed in the entire distance. Witness examined Walker's house and found in it an old musket which was in bad condition and had not been lately discharged. He examined no other houses, as he was satisfied already by Kirby's statement and the discoveries made.

Ed. Middleton, for the State, testified that, wanting to get Ed. Osborne to do some hauling, he went to the latter's house the night Kirby was killed. Osborne was not at home, but, according to his wife's statement to witness, had gone to Charles Took's about five minutes before witness arrived. Witness remained on the gallery, and in a little while heard shooting in the direction of the Seymour field. In ten or fifteen minutes thereafter, Ed. Osborne came very rapidly into the house from the direction of his crib, and said to his wife: "Let me pass, quick," and went into his room and stayed there long enough to load a pistol. As he passed his wife she said: "Some shooting is going on," and he said: "Let me get my gun or pistol." When he came out of the house he had no gun or pistol, and he stopped at his gate, and witness said to him to "come on and go down there;" to which he replied: "I don't care to go, as people are mighty curious." Witness said: "Come on, I will go with you," and they went to the place where Kirby was. From Osborne's house his crib is towards Bayer's store, and in an

opposite direction from the place of the shooting. When Osborne came to his house women were hallooing and screaming, and quite a crowd were passing to where Kirby was shot.

Cross examined, witness said that he was not told by Osborne's wife that Osborne had gone to Bayer's store to get tobacco. Witness saw no gun or pistol on Osborne when the latter came and passed into his room.

Beno Bayer, for the State, testified that he was at his store and heard the shooting the night West Kirby was killed. Ed. Osborne was not at witness's store when the firing occurred, but came there after the shooting and got some tobacco. He did not stay as long as usual.

Cross examined, the witness could not tell how long it was after the shooting when Osborne came to the store, but knew it was but a short while. Osborne did not appear excited, and witness, who had known him a long time, observed nothing unusual in his manner.

Tom Lanier, for the State, testified that he and Ed. Osborne came up town together the day preceding the night of West Kirby's death, and as they got opposite Boedeker's corner, West Kirby drove by on his wagon, and Osborne, pointing his finger at Kirby, said, " There goes one of the d—dest meanest negroes in this town." The Walker family and Kirby were unfriendly.

Dick Dodson, for the State, testified that in December, 1886, while he was living on the Seymour place, he started to Columbus one night after dark, and had to go through the gate where the Seymour pasture adjoins the Logue field. Just before he reached the gate he saw some one standing in the corner of the fence, who, as witness approached, walked down the fence fifteen or twenty steps, and witness recognized him as Ed. Osborne. The gate being locked the witness jumped over it, and, as he did so, he called Osborne by name, but received no reply. On his way back home very soon afterwards, he heard three or four shots. Where witness saw Osborne that night was at the Seymour pasture gate, where Kirby was killed.

Cross examined, the witness said he had known Osborne for four or five years. When seen by witness on the occasion in question, Osborne was standing outside the fence. Witness did not hear of the killing of Kirby until the next morning. He did not return home that night by the same route he took in going to town, because he " don't travel the same road twice the same night when he sees men standing in the corner of fences."

Allen Nail, for the State, testified that, on the day preceding the night of Kirby's death, he met and shook hands with Ed. Osborne, who had some shot and a sack of tobacco in his hand, which he changed from one hand to the other while witness was with him. Witness did not remember the size of the shot, but believed they were squirrel shot.

Silvey Kirby, the wife of the deceased, was the next witness for the State. She testified that when her husband was killed, on the night of December 22, 1886, she was at her home, which was right across the street from the defendant, Osborne's. Deceased and defendant did not speak, and were enemies for six months before the former was killed near the gate of the Seymour pasture. Deceased had just left home, leading his horses, to put them in that pasture, as he had been doing all the year. The houses of deceased and defendant were so near together that any one entering or leaving deceased's house could be seen at defendant's.

On her cross examination, this witness named several neighbors with whom she and deceased were friendly, but excepted the Walker family, who were accused by deceased of trying to poison his chickens. The enmity between defendant and deceased began at the trial of the Walker family. In Christmas, 1885, witness found poison in her meal barrel, and, in the summer of 1886, her chickens were poisoned. Deceased's occupation was wagoning and farmer. He owned no gun or pistol, and witness never knew of his having any difficulty with any one, though he had some trouble with witness's son, whom he had prosecuted for carrying a pistol. When deceased was killed, witness's son was working a hundred miles west of San Antonio. In 1885, witness and deceased had some cross words, like married people do, and she left home for a day. With that exception they got along well. She never ordered the deceased out of the house.

Charlotte Osborne, the wife of the defendant, was the first witness in his behalf. She testified that she was at home, sitting on the gallery and talking to Ed. Middleton, when she heard the shots which killed West Kirby. The defendant had been gone from home but a few minutes, having told her that he was going up town to get a sack of tobacco and to see Dan Gilbert. Middleton had been at defendant's house five or ten minutes when witness heard the shots, which were fired in the direction of the place where Kirby was found. About five minutes after the

shots, the defendant came from the direction of town. He came along upon the street sidewalk, stopped at the gate, and asked witness who was that on the gallery with her. She told him it was Ed. Middleton, and he then called Middleton and said: "Let's go down and see what's the matter." Defendant did not go into the house, but stopped at the gate. After he and Middleton had left, witness was told by Reed that Kirby was killed, and Mr. Townsend came to the house and went in and got the pistol from under the head of the bed, where the defendant always kept it. No person could, without witness's knowledge, have entered the house and put the pistol under the head of the bed; and no one did put it there after the shooting. In the morning of the day in question, one of the defendant's mules got out of his enclosure and into the Logue field. Defendant and witness, for the purpose of bringing the mule back, went down the road towards the gate of the Seymour pasture, where that pasture joins the Logue field. Defendant got over the fence of the Logue field at a point about opposite the place where Kirby was found, and drove the mule through the Logue field and back into his own enclosure, through the west gate, which he then fastened on the outside, and got over the fence himself a short distance north of the gate, because the gate could not be fastened on the inside. When Mr. Townsend came, witness told him that the pistol was under the head of the bed, and that the gun was in the crib. The only trouble between defendant and deceased, so far as witness knew, was in regard to the prosecution of the Walkers by the deceased, who wanted defendant to testify against the Walkers for poisoning chickens. Defendant refused to do so, and the deceased fell out with him about it. When Mr. Townsend came, he asked witness where Ed. was when the shooting occurred; and she, thinking Mr. Townsend meant Ed. Middleton, told him Ed. was on the front gallery with her when the shots were fired. When Townsend came, witness knew her husband was charged with the killing. Deceased was killed on Wednesday, and on the previous Monday the defendant had fired his pistol two or three times at a hawk. Either Bill Grimes or Frank Burford shot off the gun four or five times before Kirby was killed. Witness did not tell Townsend that defendant was at home when the shooting occurred, nor tell him that the only time defendant had left the house that night after supper was when he went to find his mules, nor that defendant had gone to see Dan Gilbert, who lived across the river. Wit-

ness was in a crowd going to the place of the shooting, and they met Townsend. She went back with him into her house, and he asked her where her husband's weapons were; and she told him the pistol was under the head of the bed and the gun in the crib. She testified before the coroner's jury, but did not then state that her husband came up after the shooting, nor that she thought the gun had been in the crib about a month, and thought her husband had sold it. Nor did she tell the coroner's jury that the crib was always kept locked. When asked by Townsend where her husband was at the time of the shooting, she replied that her husband had told her he was going to town for some tobacco, and was going by to see Dan Gilbert. She did not, before the coroner's jury, state anything about the mule getting out, and her husband going into the Logue field to drive it back.

Henry Green, for the defense, testified with regard to the search and discoveries of the sheriff's party for tracks and other indications in the Logue field and the defendant's premises; but no material difference appears between his testimony and that adduced by the State on the same subject.

Half a dozen witnesses for the defendant proved that he had maintained a good reputation for being a quiet and peaceable man.

Maria Hatton, for the defense, testified that she was at defendant's house the Tuesday next before the Wednesday on which Kirby was killed, and while there she heard several shots, but did not see who fired them. Defendant came in after the shots were fired, and said he had shot at a hawk. Witness did not see a pistol about him at the time.

Frank Burford, for the defense, testified that he did fire off defendant's gun at the latter's crib, a month or six weeks before Kirby was killed; and this was the only time he ever saw a gun fired at defendant's place.

Bill Grimes was called, for the defense, but stated that he never saw or heard a gun fired at defendant's place at any time before Kirby was killed.

Wash Roy, for the defense, stated that, in cotton picking time, 1886, he got from defendant a mule which had got into the Logue field.

Polly Reed, for the defense, testified that she lived between the defendant's place and the town of Columbus, and, a little before dark on the day Kirby was killed, she saw the defendant

going from his home towards town. It was after dark when the shooting occurred, but she could not say how long that was after she saw defendant going towards town.

Two doctors testified in the case, basing their opinions upon the evidence and not upon personal observation, and agreeing that Kirby came to his death by means of gun shot wounds.

The State, in rebuttal, recalled Sheriff Townsend, who testified that when he went to defendant's house, the night Kirby was shot, he asked Charlotte Osborne, defendant's wife, where Ed. was, and she replied that he was sitting on the gallery talking to her when the firing occurred, and that he had not been out of the house since supper that night, except once, and then went to feed his mules, and came right back to the house. After witness had found the pistol, and while he was looking for the gun, he turned to defendant's wife and said, "you had as well tell me where the gun is, for your husband has told me;" and then she said she believed it was in the crib, and they started to the crib, and she said she believed it was locked and that her husband had the key. Witness sent to defendant for the key, and went on to the crib, finding it unlocked, and the lock and key on a log or block near the door. There was meat, soap and oil in the crib. Witness's statement about the defendant having told him where the gun was was a fiction of his to induce defendant's wife to tell where the gun could be found. Subsequent to her statement that her husband had left the house but once that night, she told witness that her husband left home after supper, saying that he was going to see Dan Gilbert, who was in town that night.

George Crawford, in rebuttal for the State, testified that he was at the defendant's house when Sheriff Townsend was searching it, and that he heard Townsend ask defendant's wife where Ed. was when the shooting occurred, and her reply was that Ed. was sitting on the gallery when it occurred, and had not been out of the house since supper but once, and then he went to the lot to feed his mules.

Further to impeach and contradict the witness Charlotte Osborne, the State introduced her written testimony taken at the coroner's inquest upon the body of Kirby, the deceased; from which it appears that at the inquest she testified that Ed. Middleton was on the gallery with her when her husband came from the direction of the crib, but that she could not tell whether he came on the outside or the inside of the lot; that she thought the

gun had been in the crib for nearly a month, and thought her husband had sold it; and that it was a positive fact that the crib was always kept locked.

The opinion of this court discloses the facts relevant to the rulings.

*John C. Mitchell* and *J. H. Burts,* for the appellant.

*W. L. Davidson,* Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE.    This appeal is from a conviction of murder in the first degree, the penalty of death being assessed by the judgment in the court below.

On the trial, after defendant's application for a continuance had been overruled and both parties had announced ready for trial upon the merits, a jury having been selected, impaneled and sworn, but before the defendant had been arraigned or pleaded to the indictment, the district attorney moved the court, in writing, for leave to amend the caption of the indictment with regard to the time at which the term of the District Court was being held when the indictment was found—the amendment being to substitute "fourth Monday" for the words "first Monday," where the latter appeared in said indictment. Defendant objected to said amendment, but the objection was overruled by the court and the amendment permitted, the defendant saving his bill of exception to the ruling.

With regard to amendments of indictments, it is provided by statute that, when the exception to an indictment or information is merely on account of form, the same shall be amended if decided to be defective, and the cause proceed upon such amended indictment or information.    And any matter of form in an indictment or information may be amended at any time before an announcement of ready for trial upon the merits of both parties, but not afterwards.    (Code Crim. Proc., arts. 549 and 550.)

An allegation as to the court and term of court in which the indictment is presented is a matter of form and amendable. (Bosshard v. The State, 25 Texas Sup., 207; Mathews v. The State, 44 Texas, 376; Houck v. The State, 1 Texas Ct. App., 357; Long v. The State, Id., 466; Sharp v. The State, 6 Texas Ct. App., 650.)

At the time these decisions were made, Article 550, above quoted, had not been adopted.    Under that Article it will be seen

that the right to amend as to matters of form is limited to "any time before an announcement of ready for trial upon the merits by both parties, but not afterwards." Having announced ready for trial upon the merits, the allowance of amendment by the court in this case was clearly erroneous, and in contravention of the statute; and the fact that defendant had neither been arraigned nor pleaded to the indictment could not possibly affect the question, the parties having previously announced ready for trial upon the merits. Such irregularity and error, however, no exception having been made by the defendant to the indictment, being a mere formal defect, may well be considered as having been cured by the verdict subsequently rendered, and should not amount to reversible error.

By appellant's second bill of exceptions it is made to appear that, when the court was proceeding to organize the jury from the special venire which had been summoned in this case, the name of Jack Craige stood as the eighth upon the list. His name being called and he not answering, the sheriff announced to the court that, though the said name appeared in his return as one of the special veniremen who had been summoned, the said return was a mistake, the said juryman Craige never having been summoned, as stated in said return; whereupon the court, over objections of defendant, proceeded to organize said jury from the remainder of said special venire, and from talesmen subsequently ordered and summoned.

Appellant's objection to this proceeding was that the juryman Jack Craige appeared as one of the persons summoned under the special venire facias, a copy of which was served upon him; that the said juryman's was one of the names specially drawn to serve upon the venire in the cause; and that the sheriff's return on the venire did not show the diligence exercised by the sheriff to summon, or the cause, if any, that he was not summoned; that, on the contrary, the said return and service upon this defendant shows said juryman to have been summoned, when in truth and in fact it appears that he had not been summoned at all; and defendant claimed that his rights would be prejudiced by proceeding without said juryman Craige.

It is provided by statute that "no defendant in a capital case shall be brought to trial until he has had one day's service of a copy of the names of persons summoned under a special venire facias, except where he waives the right," etc. (Code Crim. Proc., art. 617.) In the early case of Bates v. The State, it was

said the law gives the accused the right of having a list of the jurors summoned upon the special venire served upon him at least one day before the trial is commenced. The object is to enable him the better to exercise his right of challenge. It is a valuable right which is not to be denied the accused. It is true it may be defeated in whole or in part by the non-attendance of the jurors, and doubtless, after their attendance, the court may excuse one or more of them for cause. But it will be readily admitted that the cause which would excuse ought not to be occasioned by the action of the court in derogation of the prisoner's right, but by something over which the court has no control. (19 Texas, 122; Thuston v. The State, 18 Texas Ct. App., 36.)

Article 640 of the Code of Criminal Procedure provides that in selecting the jury from the persons summoned, the names of such persons shall be called in the order in which they appear upon the list furnished the defendant. (Clark v. The State, 8 Texas Ct. App., 350.) There is good reason for these humane rules of the law—the serving the defendant with a copy of the names of those from whom the jury is to be selected, and requiring the names to be called according to the order of the list furnished him—because he is thus afforded time to investigate the antecedents of the jurors, and to prepare himself with reference to testing their qualifications, and exercising his right of challenge for cause, or of peremptory challenge, upon them. In the language of Judge Wheeler, in the Bates case, supra, the right is a valuable one, and one which should not be denied him.

It is true the man Craige had not been summoned as a juryman. This, however, makes no difference to the defendant, since he had been made to believe by the officers of court that Craige had been summoned, whilst, through no fault of his own, said juryman had not been summoned. In so far as the defendant was practically concerned, the juryman had, to all intents and purposes, been summoned; and it was as much beyond the power of the court to ignore that fact, or to deny the defendant his rights under it, in contemplation of the facts, as it would have been for the court to have excused the juryman without sufficient cause, if he had in fact been summoned,—which authority on the part of the court has time and again been expressly denied. (Hill v. The State, 10 Texas Ct. App., 618; Wade v. The State, 12 Texas Ct. App., 358; Stirling v. The State, 15 Texas Ct.

App., 249; Kennedy v. The State, 19 Texas Ct. App., 618.) The action of the court in assuming such power is neither palliated nor excused by the fact that the defendant subsequently selected the jury which tried the case, without exhausting his peremptory challenges. (See authorities cited above.)

In this case, when it was made to appear that so serious a mistake had occurred with regard to the juryman Craige, the court should, in case the defendant refused to waive, and insisted upon having him there, have stopped the proceedings, placed the jurors already accepted in the custody of the sheriff, and postponed the case until the juryman Craige could have been sent for and brought into court; or the court should have discharged the jurors already taken, ordered a new special venire summoned, and had a copy of the same served upon the defendant, and the trial postponed until it could be commenced anew, as though the case had never been called for trial. Either of the above modes of procedure would have fully guarded and protected all the rights of the defendant in the premises. Appellant in this case could not have demanded an attachment for the juryman Craige, because the said juryman had in fact never been summoned. (Code Crim. Proc., art. 618; Thuston v. The State, 18 Texas Ct. App., 26; Thompson v. The State, 19 Texas Ct. App., 593; Kennedy v. The State, Id., 618; Murray v. The State, 21 Texas Ct. App., 466.)

As made to appear to us in this record, defendant has been denied rights guaranteed to him by the laws, and on account of which the judgment rendered against him must of necessity be reversed.

In reversing the case, we deem it our duty to call the attention of the court below to a special instruction given at the instance of the district attorney, as follows: "If the jury find from the evidence that the defendant killed the deceased, and that the said killing was murder, as murder has heretofore been defined by the court, and that such murder was committed while the defendant was lying in wait for the purpose of killing the deceased, then such murder would be murder of the first degree."

It occurs to us that, if this instruction is not upon the weight of evidence, it trenches so nearly thereupon as to make it very questionable whether it was proper that it should have been given. A fair construction of the language used seems to import the same as though the jury had been told that a killing committed by a party lying in wait would *per se* be murder in the

first degree. Lying in wait is simply evidence of express malice, and one of the illustrations given by standard authors in the definition of that character of malice. It is not one of the definitions of murder in the first degree given by our statute. We are of opinion that it was error to give this charge, though it was not excepted to in the court below, nor is it complained of here on appeal.

Several other errors are assigned and discussed in the brief of counsel for appellant, which we do not deem it necessary to notice, inasmuch as those which are considered material are of a character not likely to arise on another trial. For the errors which we have above discussed, the judgment is reversed and the cause remanded for another trial.

*Reversed and remanded.*